**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| NATHAN ETTER individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KNOXVILLE TVA EMPLOYEES CREDIT UNION and MARQUIS SOFTWARE SOLUTIONS, INC.,<br><br>Defendants. | Case No.<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Nathan Etter ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Knoxville TVA Employees Credit Union ("KTVAECU"), and Marquis Software Solutions, Inc. ("Marquis") (together, "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendants' failure to protect highly sensitive data.

2. Defendant Marquis Software is a marketing and compliance software and services provider that specializes in providing services to banks and credit unions.[1]

[1] *See Home*, MARQUIS, https://gomarquis.com/ (last visited Jan. 19, 2026).

3. Defendant KTVAECU is a Tennessee state-chartered credit union headquartered in Knoxville, Tennessee, and has over 23 branches in East Tennessee.[2] KTVAECU is third-largest credit union in the state of Tennessee with over $5 billion dollars in assets.[3]

4. Marquis is a digital and physical marketing and communications vendor for KTVAECU.[4]

5. As such, Marquis stores a litany of highly sensitive personal identifiable information ("PII" or "Private Information") about the current and former customers of Defendant KTVAECU.

6. Plaintiff's and Class Members' PII—which was entrusted to Defendants on the mutual understanding that Defendants would protect against disclosure—was targeted, compromised and unlawfully accessed due to the Data Breach.

7. On August 14, 2025, Defendant Marquis "identified suspicious activity on [their] network and later determined that it was the result of a cybersecurity incident (the "Data Breach").[5] Upon learning of the incident, Defendant Marquis immediately launched an investigation to determine the nature and scope of the Data Breach.[6]

8. The PII compromised in the Data Breach includes, but is not limited to, Plaintiff's and Class Member's Social Security numbers and dates of birth.[7] Indeed, Defendant Marquis reported to the Maine Attorney General that the PII impacted potentially involved includes names,

---

[2] *About Us*, KTVAECU, https://www.tvacreditunion.com/about-us.html (last visited Jan. 19, 2026).
[3] *Id.*
[4] *See* Plaintiff Etter's Notice Letter, which is attached as Exhibit A.
[5] Ex. A.
[6] *Id.*
[7] *Id.*

addresses, phone numbers, Social Security numbers, Taxpayer Identification Numbers, financial account information without security or access codes, and dates of birth.[8]

9. Defendant Marquis' investigation revealed "that an unauthorized third party accessed Marquis' network through its SonicWall firewall on August 14, 2025, and may have acquired certain files from its systems.[9] The files contained Personal Information received from certain business customers.[10]

10. Here, upon information and belief, cybercriminals had unfettered access and acquired Plaintiff's and Class Members' PII from the Defendant Marquis' systems for an extended period of time and the hackers were able to infiltrate Defendant Marquis' information systems and perform malicious activity—likely including reconnaissance and data exfiltration functions that should have had alarm bells ringing.

11. Thus, Defendant Marquis failed to implement reasonable, industry standard cybersecurity safeguards sufficient to detect malicious activity in a timely manner, including monitoring, logging, and alerting systems such as EDR, XDR, data loss prevention tools, and centralizing alerting and logging.

12. Moreover, despite the fact that Defendant Marquis became aware of the Data Breach on August 14, 2025, Defendants waited until December 29, 2025—nearly 5 months after the Data Breach and well past the industry standard timeline—to inform the victims affiliate of the Data Breach via letter (the "Notice Letter").[11] Plaintiff has yet to receive a Notice Letter from

---

[8] *Data Breach Notifications: Marquis Software Solutions*, ME. ATT'Y GEN. (Nov. 26, 2025), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/d8efd2f6-f52d-49d3-be53-028e9a8cb837.html.
[9] *Id.*
[10] *Id.*
[11] Ex. A.

KTVAECU. However, Marquis' letter clarifies the relationship between KTVAECU and states "[i]mportantly, your financial institution's [KTVAECU] internal systems were not impacted; the incident was limited to Marquis' environment."[12]

13. Upon information and belief, Defendant KTVAECU learned of the Data Breach in October or November 2025.[13]

14. This timeline betrays a shockingly ill-prepared cybersecurity posture, particularly because Tenn. Code Ann. § 47-18-2107 mandates that following discovery or notification of a breach of security system by an information holder, the information holder—which means any persons or business that conducts business in Tennessee and owns or licenses computerized personal information of Tennessee residents—shall disclose the breach of system security to any reside whose personal information was, or is reasonably believed to have been, acquired by an unauthorized person no later than 45 days from the discovery or notification of the breach.

15. Defendant Marquis' prolonged investigation and response time, in addition to the *modus operandi* of cybercriminals for similar data breaches to use a double-extortion model,[14] strongly suggests either (i) Defendant Marquis only discovered the Data Breach upon delivery of a ransom note after the cybercriminals completed its attack; or (ii) Defendant Marquis discovered the attack prior to the ransom note, but could not prevent the cybercriminals from accessing and exfiltrating PII store on Defendant Marquis' network. This evidences that Defendant Marquis lacks a reasonable incident response plan, which is an elementary aspect of any cybersecurity program

---

[12] Ex. A.

[13] Jonathan Greig, *Two More Banks Notifying Thousands of Victims About Marqui Software Ransomware Attack*, THE RECORD (Dec. 29, 2025), https://therecord.media/banks-marquis-software-ransomware (stating that between late October and early November Marquis software notified credit unions, financial institutions and state regulators about the Data Breach.)

[14] *#Stop Ransomware Guide*, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited Jan. 19, 2026).

and is designed to ensure timely responses and investigations. It is unknown for precisely how long the cybercriminals had access to Defendant Marquis' network before the breach was discovered. In other words, Defendant Marquis had no effective means to prevent, detect, stop or mitigate breach of their systems, thereby allowing cybercriminals unrestricted access to the Plaintiff's and Class Members' PII.

16. Given the Defendant Marquis' failure in even the most basic requirements of cybersecurity, it is likely that Defendant Marquis' cybersecurity program as a whole is severely inadequate in comparison to the measures it is legally obligated to provide to individuals for whom it collects Personal Information, thus leaving them exposed to the Data Breach that indeed came into fruition.

17. In other words, Defendant Marquis had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to Plaintiff's and Class Members' PII.

18. Further, Defendant Marquis' Notice Letter obfuscated the nature of the breach and the threat it posed—refusing to tell Plaintiff and Class Members, among other things, who was the cybercriminal group responsible, how long the cybercriminals had access to its network and servers; how many people were impacted; or the alleged steps taken to address the incident.

19. Defendants' delay in informing and failure to provide clear notice of the Data Breach even though Plaintiff and Class Members had their most PII accessed, exfiltrated, and stolen, caused Plaintiff and Class Members to suffer ascertainable losses in the form of the loss of the benefit of their bargain and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.

20. Moreover, Defendant KTVAECU failed to adequately protect Plaintiff's and Class Members' PII and failed to ensure that its vendor Marquis would maintain adequate safeguards to protect KTVAECU customers' PII.

21. As a result of the Data Breach, Plaintiff and Class Members, suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant Marquis' possession and is subject to further unauthorized disclosures so long as Defendant Marquis fails to undertake appropriate and adequate measures to protect the PII.

22. The Data Breach was a direct result of Defendant Marquis' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect Plaintiff's and Class Members PII from a foreseeable and preventable cyber-attack.

23. The Data Breach was a direct result of Defendant KTVAECU's failure to ensure Defendant Marquis had adequate and reasonable cyber-security procedures and protocols necessary to protect Plaintiff's and Class Members' PII from a foreseeable and preventable cyber-attack.

24. Defendants maintained, used, and shared PII in a reckless manner. In particular, the PII was used and transmitted by Defendant Marquis in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper

disclosure of Plaintiff's and Class Members' PII was a known risk to Defendants, and thus, Defendants were on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

25. Defendants disregarded the rights of Plaintiff and Class Members by, inter alia, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure Defendant Marquis' data systems were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

26. Plaintiff's and Class Members' identities are now at risk because of Defendants' negligent conduct because the PII that Defendants collected and maintained has been accessed and acquired by data thieves.

27. Plaintiff and Class Members may also incur out of pocket costs, including to purchase credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

28. Indeed, the Notice Letter has made it clear that Plaintiff and the putative Class Members should spend time monitoring accounts and attempting to prevent the imminent harm that they now face. The Notice Letter instructs them to remain vigilant and enroll in credit monitoring services, all the while offering only the legally minimum credit monitoring services that are woefully inadequate to protect Plaintiff from the harms they must now face as a result of the disclosure of their PII, including their Social Security numbers.[15]

---

[15] *See* ME. ATT'Y GEN., *supra* note 8.

29. As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

30. Plaintiff brings this class action lawsuit on behalf all those similarly situated to address Defendants' inadequate safeguarding of Class Members' PII, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

31. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself, and all similarly situated individuals whose PII was accessed during the Data Breach.

32. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe because Defendants still have possession of their immutable information, thus entitling Plaintiff and the Class to injunctive and other equitable relief.

33. The exposure of the PII to cybercriminals is a bell that cannot be unrung. Before this data breach, their PII was exactly that—private. Not anymore. Now, their PII is forever exposed and unsecure.

## PARTIES

34. Plaintiff, Nathan Etter, is a natural person and a citizen of Bean Station, Tennessee. He is domiciled in Tennessee (where he intends to remain).

35. Defendant KTVAECU is a Tennessee chartered credit union with its principal place of business at 1409 Centerpoint Blvd, Knoxville, Tennessee 37932. Defendant KTVAECU's registered agent is Shannon Kirk York who can be found at the same address.

36. Defendant Marquis Software Solutions, Inc. is a Texas corporation with its principal place of business at 6509 Windcrest Dr., Ste 170, Plano, Texas 75024. Its Registered Agent in C T Corporation System is located at 1999 Brayn St., Ste 900, Dallas, Texas 75201.

## JURISDICTION AND VENUE

37. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, there are thousands of Class Members, many of whom reside outside the state of Tennessee and have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

38. This Court has general personal jurisdiction over Defendants because KTVAECU is headquartered and has its principal place of business in this District, and because both Marquis and KTVAECU regularly conduct business in Tennessee, have sufficient minimum contacts in Tennessee, and purposefully availed themselves to the Courts in this District.

39. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant KTVAECU resides in this District, a substantial part of the events giving rise to this action occurred in this District.

## BACKGROUND

***Defendants Collected and Stored the PII of Plaintiff and the Class***

40. Defendant Marquis Software is a marketing and compliance software and services provider that specializes in providing services to banks and credit unions.[16]

[16] *See Home*, MARQUIS, https://gomarquis.com/ (last visited Jan. 19, 2026).

41. Defendant KTVAECU is a Tennessee state-chartered credit union headquartered in Knoxville, Tennessee, and has over 23 branches in East Tennessee.[17] KTVAECU is third-largest credit union in the state of Tennessee with over $5 billion dollars in assets.[18]

42. Marquis is a digital and physical marketing and communications vendor for KTVAECU.[19]

43. As part of their business, Defendant KTVAECU collects and maintains the Private of thousands of their current and former customers.

44. Plaintiff and Class Members are comprised of current and former customers of Defendant KTVAECU. The PII provided by Plaintiff and Class Members includes, but is not limited to names, phone numbers, addresses, dates of birth, and Social Security numbers.

45. As part of their businesses, Defendant KTVAECU contracted with Marquis for software, data management, and analytic services, and provided the collected PII to Defendant Marquis.

46. As part of its business, Defendant Marquis collects and maintains the PII of the current and former customers of KTVAECU.

47. In collecting and maintaining the PII, Defendants agreed they would safeguard the data in accordance with their internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII.

---

[17] *About Us*, KTVAECU, https://www.tvacreditunion.com/about-us.html (last visited Jan. 19, 2026).
[18] *Id.*
[19] *See* Plaintiff Etter's Notice Letter, which is attached as Exhibit A.

48. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members relied on Defendants to keep their PII confidential and securely maintained, and to make only authorized disclosures of this information.

49. Under state and federal law, businesses like Defendants have duties to protect current and former customers' PII and to notify them about breaches.

50. On information and belief, Defendants have not implemented reasonably cybersecurity safeguards or policies to protect Plaintiff's and Class Members' PII or supervised its IT or data security agents and employees to prevent, detect, and stop breaches of their or their vendor's systems. As a result, Defendants leave significant vulnerabilities in their systems for cybercriminals to exploit and gain access to Plaintiff's and Class members' PII.

51. Moreover, upon information and belief, Defendant KTVAECU has not required or ensured their vendors implemented reasonable practices to keep Plaintiff's and Class Members' sensitive PII confidential and securely maintained, used and disclosed it for necessary and authorized purposes only, deleted the data from network systems or applications when no longer necessary for legitimate business purposes, and trained employees on reasonable cybersecurity red flags and protection techniques

***The Data Breach***

52. Despite its duties and alleged commitments to safeguard PII, Defendants did not in fact follow industry standard practices in securing Plaintiff's and the Class Members' PII, as evidenced by the Data Breach.

53. Defendants have obligations created by the FTC Act, contract, common law, and industry standards to keep Plaintiff's and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

54. Plaintiff received a Notice Letter from Defendant Marquis informing him that:

> At Marquis Software Solutions ("Marquis" or "we"), a digital and physical marketing and communications vendor Knoxville TVA Employees Credit Union, protecting your personal and financial information is one of our highest priorities. We are writing to let you know about a recent data security incident that may have involved some of your information.
>
> **What Happened**: On August 14, 2025, we identified suspicious activity on our network and later determined that it was the result of a cybersecurity incident. Upon learning of the incident, we immediately launched an investigation and engaged the appropriate cybersecurity experts to assist. We also promptly notified law enforcement. Our investigation determined that an unauthorized third party accessed our network and may have accessed and acquired certain files from our system. Importantly, your financial institution's internal systems were not impacted; the incident was limited to Marquis' environment.
>
> **What Information Was Involved:** We reviewed the contents of the copied files to determine if they contained any personal information. On December 2, 2025, we determined that the following data of yours was included in the copied files: Social Security number and date of birth. At this time, we have no evidence of the misuse, or attempted misuse, of personal information as a result of this incident.
>
> **What We Are Doing:** In addition to the actions described above, we have taken steps to reduce the risk of this type of incident occurring in the future. We are also notifying you of the incident so that you can be aware and take steps to protect your information, if you feel it is appropriate to do so. Although we do not have evidence of any information potentially involved in this incident being used for unauthorized purposes, out of an abundance of caution, we are offering you a complimentary 12 month membership of Epiq Privacy Solutions ID. . . .

55. Omitted from the Notice Letter was the identity of the cybercriminals who perpetrated this Data Breach, the length of the Data Breach, details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertake to ensure such a breach does not occur again. Although Defendant Marquis has clarified that an unauthorized third party accessed Marquis' network through its SonicWall firewall,[20] Defendant has provided little to no other information regarding the nature or scope of the data breach.

---

[20] *See* ME. ATT'Y GEN*, supra* note 8.

56. This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

57. Despite Defendants' intentional opacity about the root cause of this incident, several facts may be gleaned from the Notice Letter, including (a) that this Data Breach was the work of cybercriminals; (b) that the cybercriminals first infiltrated Defendant Marquis' networks and systems, and downloaded data from the networks and systems (aka exfiltrated data, or in layperson's terms "stole" data; and (c) that once inside Defendant Marquis' networks and systems, the cybercriminals targeted information including Plaintiff's and Class Members' PII.

58. Further, Defendant Marquis took roughly 5 months to complete its internal investigation and to inform the victims of the Data Breach.[21]

59. This timeline betrays a shockingly ill-prepared cybersecurity posture, particularly because Tenn. Code Ann. § 47-18-2107 mandates that following discovery or notification of a breach of security system by an information holder, the information holder—which means any persons or business that conducts business in Tennessee and owns or licenses computerized personal information of Tennessee residents—shall disclose the breach of system security to any reside whose personal information was, or is reasonably believed to have been, acquired by an unauthorized person no later than 45 days from the discovery or notification of the breach.

60. The lengthy and delayed Data Breach investigation revealed Defendant Marquis' cyber and data security systems were completely inadequate and allowed cybercriminals to obtain files containing a treasure trove of thousands of its customers' highly sensitive PII.

[21] Ex. A.

61. Further, the Notice Letter contends to have taken steps to address the Data Breach and implement additional measures to prevent another Data Breach. Although Defendant Marquis fail to expand on what these alleged steps are, such steps should have been in place prior to the Data Breach.

62. To date, Defendants have done nothing to provide Plaintiff and the Class Members with relief for the damage they have suffered because of the Data Breach. The Notice Letter merely offered Plaintiff and Class Members complimentary credit monitoring for one year, despite the fact that experts recommend at least seven years. [22] But this does not compensate them for damage incurred and time spent dealing with the Data Breach. Signing up for this service requires Plaintiff and Class Members to forfeit time that could otherwise be spent making money or enjoying life.

63. Through its inadequate security practices, Defendants exposed Plaintiff's and the Class's PII for theft and sale on the dark web.

64. Moreover, on information and belief, cybercriminals have already leaked the stolen PII of thousands of Defendants' current and former customers.

65. Further, Defendant Marquis' prolonged investigation and response time, in addition to the cybercriminal group cybercriminals' *modus operandi* of using a double extortion model, strongly suggests either (i) Defendant Marquis only discovered the Data Breach upon delivery of a ransom note after the cybercriminals completed most of their attack, or (ii) Defendant Marquis discovered the attack prior to the ransom note but could not prevent the cybercriminals from accessing and exfiltrating PII stored on Defendant Marquis' network, either of which is strong

[22] Chi Chi Wu, *Essentials About Credit reporting: Consumer Debt Advice form NCLC*, NAT'L CONSUMER L. CTR. (July 6, 2018), https://library.nclc.org/article/essentials-about-credit-reporting-consumer-debt-advice-nclc (explaining how most negative information stays on your credit report for seven years).

evidence that Defendant Marquis' lack a reasonable incident response plan—an elementary aspect of any cybersecurity program that is designed to ensure timely responses and investigations.

66. Even with several months of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiff's and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

67. Because of the Data Breach, the sensitive PII of Plaintiff and Class Members was placed into the hands of cyber criminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

68. Moreover, Defendant KTVAECU owed a duty to protect Plaintiff and Class Members from the harm that KTVAECU's third-party vendor's insufficient date security and the consequential exposure of PII would cause, because such harm was foreseeable and reasonably preventable.

69. KTVAECU knew Marquis was storing valuable, sensitive PII and that as a result, Marquis' systems would be an attractive target for cybercriminals.

70. KTVAECU also knew that any breach of Marquis' network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the tens of thousands individuals whose PII was compromised, as well as intrusion into their private and sensitive financial matters.

71. KTVAECU failed to ensure that Marquis had adequate and reasonable means to meet the Industry and FTC standards, as well as protect KTVAECU customers' PII

72. The Data Breach is the direct result of Defendants' failure to implement basic data security measures over consumers' data in its custody and control. Had Defendant Marquis implemented reasonable cybersecurity measures and/or had Defendant KTVAECU ensured that

its third-party vendors implemented the reasonably cybersecurity measures—including adequate safeguards for initial access, encryption, or redaction of personal data elements, and sufficient logging, monitoring, and alerting tools to detect unauthorized activity—cybercriminals would not have been able to hack into Defendant Marquis' network, perform reconnaissance necessary to locate Plaintiff's and Class Members' PII, and then exfiltrate that data before being detected.

73. Marquis could and should have prevented this Data Breach by protecting Plaintiff's and Class Member's PII through industry standard safeguards.

74. Additionally, KTVAECU could have prevented this Data Breach by examining Marquis' cybersecurity protocols and ensuring vulnerabilities were identified and addressed and reasonable safeguards were continuously maintained, but failed to do so.

75. Defendants could have prevented the Data Breach by examining, testing, and updating their cybersecurity practices to ensure vulnerabilities were identified and addressed and reasonable safeguards were continuously maintained, but failed to do so.

76. Defendants' tortious conduct and breach of contractual obligations, as detailed in herein, are evidence by its failure to identify the scope of information involved and/or individuals impacted by the Data Breach until months after cybercriminals breached its network and accessed Plaintiff's and Class Members' PII stored therein—meaning Defendants had no effective means in place to ensure that cyberattacks were detected, prevented, or timely investigated.

77. Defendant's gross negligence in safeguarding Plaintiff's and Class Members' PII is exacerbated by the repeated warnings and alerts regarding the need to protect and secure sensitive data, as well as the ubiquitous nature of data breaches.

78. As a result of the Data Breach, Plaintiff and Class Members now face an increased risk of fraud and identity theft, among many other actual and imminent damages.

79. Moreover, Plaintiff and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendants, is protected from further breaches.

***The Data Breach Was a Foreseeable Risk of which Defendants Were on Notice.***

80. Plaintiff and Class Members value their PII, as in today's electronic-centric world, their PII is required for numerous activities, such as new registrations to websites, or opening a new bank account, as well as signing up for special deals.

81. In light of recent high profile data breaches, Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

82. In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year. [23]

83. In April 2020, ZDNet reported, in an article tilted "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporation information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[24]

84. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to

---

[23] 2024 DATA BREACH REPORT 6, IDENTITY THEFT RES. CTR. (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

[24] Catalin Cimpanu, *Ransomware Mentioned in 1,000+ SEC Filings Over the Past Year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion." [25]

85. Defendants' data security obligations were also particularly important given the substantial increase in Data Breaches in the financial industry preceding the date of the breach. Because of the value of its collected and stored data, the industry has experienced a higher number of data theft events than other industries.

86. This readily available and accessible information confirms that, prior to the Data breach, Defendants knew or should have known that (i) ransomware actors were targeting entities such as Defendants, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendants, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

87. Before the Data Breach, Defendants knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as a result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

88. Defendants knew or should have known that it should have encrypted their customers' Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

---

[25] *Stop Ransomware Guide*, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited Jan. 19, 2026).

***Defendants Could Have Prevented the Data Breach***

89. Data breaches are preventable.[26] Indeed, the American Bar Association published a treatise titled the Data Breach and Encryption Handbook wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." [27]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[28]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[29]

***Defendants Fail to Comply with FTC Guidelines***

90. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

---

[26] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH & ENCRYPTION HANDBOOK (2012).
[27] *Id.* at 17.
[28] *Id.* at 28.
[29] *Id.*

91. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[30]

92. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

93. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

94. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

---

[30] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

95. The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

96. Defendants failed to properly implement basic data security practices, and their failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Moreover, Defendant KTVAECU failed to ensure and require Defendant Marquis implement the basic data security practices, and such failure constitutes an unfair or practice prohibited by the FTC Act.

***Defendants Failed to Comply with Industry Standards***

97. As shown above, experts studying cyber security routinely identify businesses such as the Defendants as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

98. To prevent and detect unauthorized cyber-attacks, Defendant Marquis could and should have implemented—and Defendenant KTVAECU should have ensured and required Defendant Marquis implement—as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC),

and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with at least privilege in mind. If a user only needs to read specific files, the user should not have written access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[31]

[31] How to Protect Your Networks from Ransomware 3–4, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (U.S. Government Interagency technical guidance document) (last visited Jan. 19, 2026).

99. To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant Marquis could and should have implemented—and Defendenant KTVAECU should have ensured and required Defendant Marquis implement—as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks . . . .

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the Internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) . . . .

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it. . . .

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic. . . .[32]

---

[32] *Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SEC. AGENCY (April 11, 2019), https://www.cisa.gov/news-events/news/protecting-against-ransomware (revised Sept. 2, 2021).

100. To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant Marquis could and should have implemented—and Defendenant KTVAECU should have ensured and required Defendant Marquis implement—as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection

- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[33]

101. Given that Defendants were storing the PII of Plaintiff and Class Members, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

102. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

103. The foregoing frameworks are existing and applicable industry standards in the Defendants' industry, and Defendants failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

***The Data Breach Caused Plaintiff and the Class Members Injury and Damages***

104. Plaintiff and members of the proposed Class have suffered injury and damages from the unauthorized disclosure and misuse of their PII disclosed in the Data Breach that can be directly traced to Defendant, that has occurred, is ongoing, and/or will imminently occur.

105. Data Breaches such as the one experienced by Plaintiff and Class Members are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

---

[33] *Human-Operated Ransomware Attacks: A Preventable Disaster*, MICROSOFT THREAT INTELLIGENCE (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster.

106. As stated above, on information and belief, in the Data Breach, cybercriminals were able to access the Plaintiff's and the proposed Class Members' PII, which is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the Dark Web for sale, causing widespread injury and damages.

107. Once an individual's PII is for sale and access on the dark web, cybercriminals are able to use the stolen and compromised to gather and steal even more information. [34]

108. The ramifications of Defendants' failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

109. Because Defendants failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer injury-in-fact and damages, including but not limited to:

a. The loss of the opportunity to control how PII is used;

b. Unauthorized use of stolen PII;

c. Dramatic increase in spam telephone calls;

d. Emotional distress;

e. The compromise and continuing publication of their PII;

f. Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud, and for necessary credit monitoring and identity theft protection;

g. Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and

---

[34] Ryan Toohil, *What do Hackers do with Stolen Information*, AURA, (September 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

h. The diminution in value of their PII; and,

i. The continued risk to their PII, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the PII in its possession.

*The Data Breach Cause Plaintiff and the Class Increased Risk of Identity Theft*

110. The Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

111. Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendants' failures resulted in Plaintiff's and Class Members' PII falling into the hands of identity thieves.

112. The unencrypted PII of Class Members has already or will end up for sale on the dark web, because that is the modus operandi of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the PII for the express purpose of conducting financial fraud and identity theft operations.

113. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.35 Experian reports that a stolen credit or debit card number can

[35] Anita George, *Your Personal Data Is for Sale On the Dark Web. Here's How Much It Costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

sell for $5 to $110 on the dark web.36 Criminals can also purchase access to entire company data breaches from $900 to $4,500.37

114. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

115. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information…[is] worth more than 10x on the black market."[38]

116. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

117. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the them to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

118. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to

---

[36] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.

[37] *For Sale in the Dark*, VPNOverview, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark (last visited Jan 19, 2026).

[38] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10X Price of Stolen Credit Card Numbers*, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

119. Identity thieves can also use an individual's personal data and PII to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.39

120. Further, the standard operating procedure for cybercriminals is to use some data, like the PII here, to access "Fullz packages" of that person to gain access to the full suite of additional PII that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victim's information to perpetrate even more types of attacks.

121. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

122. The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain

---

[39] *Identity Theft and Your Social Security Number,* SOC. SEC. ADMIN., 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited Jan. 19, 2026).

information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

123. There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.

124. Individuals, like Plaintiff and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hackers' purposes.

125. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information

increases."40 Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[41]

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[42]

126. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[43] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[44]

127. Identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's Private Information to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

128. Such fraud may go undetected until debt collection calls commence months, or even years later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax

---

[40] *See Avoid Identity Theft*, SOC. SEC. ADMIN., https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases (last visited Jan. 19, 2026).

[41] *Id.*

[42] *Identity Theft and Your Social Security Number*, SOC. SEC. ADMIN. (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[43] *See How to Protect Yourself from Social Security Number Identity Theft*, EQUIFAX, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited Jan. 19, 2026).

[44] *See* Julia Kagan, *What is a SSN? What to Know About Social Security Numbers*, INVESTOPEDIA (Sept. 2, 2024) https://www.investopedia.com/terms/s/ssn.asp.

returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

129. Data Breach victims suffer long-term consequences when their social security numbers are taken and used by hackers. Even if they know their social security numbers are being misused, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of social security number misuse.

130. It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

131. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[45]

132. Similarly, the Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting

---

[45] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other PII, such as your name and address, remains the same."[46]

133. The California state government warns that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[47]

134. The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[48]

135. Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls. For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Moreover, thirty-three percent reported not having

---

[46] *Identity Theft and Your Social Security Number*, Pub. No. 05-10064, SOCIAL SEC. ADMIN. (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[47] *See Your Social Security Number: Controlling the Key to Identity Theft*, CAL. DEPT. JUST. https://oag.ca.gov/idtheft/facts/your-ssn (last visited Jan. 19, 2026).

[48] *What To Do Right Away*, FTC (2024), https://www.identitytheft.gov/Steps.

enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated.[49]

136. What's more, theft of PII is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, PII are valuable property rights.

137. PII are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

138. Where the most PII belonging to Plaintiff and Class Members was accessible from Defendants' network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

139. Further, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when PII and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[50]

---

[49] *The Identity Theft Resource Center's 2021 Consumer Aftermath Report Reveals Impacts on Covid-19 Identit Crime Victims*, IDENTITY THEFT RES. CTR. (May, 26, 2021), https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/.

[50] *See* GAO Report, at p. 29.

140. Thus, Plaintiff and the Class Members must vigilantly monitor their financial and credit accounts for many years to come.

141. Accordingly, the Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein.

142. Defendants knew or should have known of these harms which would be caused by the Data Breach they permitted to occur and strengthened its data systems accordingly.

*Loss of Time to Mitigate Risk of Identity Theft and Fraud*

143. Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that his or her PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and Defendants arguing that the individual failed to mitigate damages.

144. The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiff's and Class Members' Social Security numbers or other government identifications are affected.

145. By spending this time, Plaintiff was not manufacturing their own harm, they were taking necessary steps at Defendants' direction and because the Data Breach included their Social Security numbers.

146. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because

of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

147. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to her good name and credit record."[51]

*Diminution in Value of Private Information*

148. PII is a valuable property right.[52] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond doubt that PII has considerable market value.

149. An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[53]

150. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[54]

---

[51] See GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOV'T OFFICE, (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[52] *See, e.g.*, Randall T. Soma et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[53] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, L.A. TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[54] *See e.g.*, https://datacoup.com/ (last visited Jan. 19, 2026).

151. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[55]

152. Conversely, sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[56]

153. As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

*The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary*

154. Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

155. Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

156. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect

[55] *Frequently Asked Questions*, NIELSON COMPUT. & MOBIL PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Jan. 19, 2026).

[56] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their PII.

*Lost Benefit of the Bargain*

157. Furthermore, Defendants' poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to provide Defendants with their PII under certain terms, Plaintiff and Class Members understood and expected that Defendants would properly safeguard and protect their PII, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received services and/or employment of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

***Plaintiff's Experiences***

158. Plaintiff Nathan Etter is a current customer of Defendant KTVAECU, which obtained Plaintiff's Personal Information in the course of its regular business operations.

159. Upon information and belief, Defendant KTVAECU provided Plaintiff's PII to Defendant Marquis.

160. Upon information and belief, at the time of the Data Breach, Defendants maintained Plaintiff's PII in their systems.

161. Plaintiff received the Notice letter, by U.S. mail, directly from Defendant, which was dated December 29, 2025. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties including his date of birth and Social Security number.

162. Plaintiff is very careful about sharing his sensitive PII. Plaintiff stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted

unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendant had he known of Defendants' lax data security policies.

163. In order to obtain services from Defendant KTVAECU, Plaintiff was required to provide his PII to Defendants, including among other things, his name, contact information, address, date of birth, and Social Security number.

164. Plaintiff provided his PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

165. Plaintiff reasonably understood that a portion of the funds derived from his purchases would be used to pay for adequate cybersecurity and protection of PII.

166. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, as well monitoring and reviewing credit report and financial account statements for any indications of attempted identity theft or fraud. Plaintiff has spent significant time dealing with the Data Breach—roughly 5 hours of his valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

167. Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (ix) the continued and certainly increased risk to his PII,

which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

168. Plaintiff suffered actual injury from the increase in spam, suggesting that his PII has been stolen and is now in the hands of cybercriminals.

169. Plaintiff suffered actual injury from the fraudulent lien for $13 placed on his bank account by an unknown-third party.

170. On information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

171. Through its Data Breach, Defendants compromised Plaintiff's PII. As a result, Plaintiff was injured by Defendants' Data Breach.

172. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

173. As a result of the Data Breach and given Defendant's explicit instructions, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

174. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

175. Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

176. Plaintiff greatly values his privacy, and would not have provided his PII, undertaken the services and paid the amounts that he did if he had known that his PII would be maintained using inadequate data security systems.

## CLASS ACTION ALLEGATIONS

177. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach that impacted Defendants.

178. Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any Defendants officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

179. Plaintiff reserves the right to amend the class definition.

180. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

181. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control. After all, Defendants maintain detailed records containing their PII.

182. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the putative class consists of hundreds of members—as it includes their current and former customers.

183. Typicality. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendants, and Defendants' complete failure to notify individuals of the Data Breach.

184. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. Plaintiff's interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that are experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

185. Commonality and Predominance. Plaintiff's and the Class's claims raise common facts and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendants had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b. If Defendant KTVAECU failed to ensure an require Defendant Marquis implemented and maintained reasonable security procedures, practices, and policies.

c. if Defendants failed to implement and maintain reasonable security procedures, practices, and policies appropriate to the nature and scope of the information compromised in the Data Breach;

d. if Defendants were grossly negligent in maintaining, protecting, and securing PII;

e. if Defendants breached contract promises to safeguard Plaintiff and the Class's PII;

f. if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

g. if Defendants' Breach Notice was reasonable;

h. if the Data Breach caused Plaintiff and the Class injuries;

i. what the proper damages measure is; and

j. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

186. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
**Gross Negligence and Negligence *Per Se***
**(On Behalf of Plaintiff and the Class against Defendants)**

187. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188. Plaintiff brings this claim individually and on behalf of the Class Members.

189. Defendants knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' PII, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

190. Defendants had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII.

191. Defendants had, and continue to have, a duty to timely disclose that Plaintiff's and Class Members' PII within its possession was compromised and precisely the types of information that were compromised.

192. Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act, and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected individuals' PII.

193. Section 5 of the FTC Act, 15 U.S.C. 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendants of failing to use reasonable measures to protect Plaintiff's and Class Members' PII. Various FTC publications and orders also form the basis of Defendants' duties.

194. In particular, Defendant KTVAECU has duty of care to use reasonable security measures arose as a result of a special relationship that existed between it and its customers. Both Defendants were in a position to ensure that Defendant Marquis' systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

195. By accepting, collecting, and storing KTVAECU customers' PII, Marquis took on

the obligation and duty to safeguard the highly sensitive PII from unauthorized disclosures, but failed to do so.

196. Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential PII.

130. Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII.

131. The specific reckless and grossly negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII;

b. Failing to adequately monitor the security of their networks and systems and to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information; and

c. Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards.

d. Failing to detect the breach at the time it began or within a reasonable time thereafter; and

e. Failing to follow their own privacy policies and practices published to their employees and residents.

132. Defendants' conduct went far beyond ordinary negligence. Defendants acted with gross negligence by consciously and recklessly disregarding known risks to Plaintiff's PII, including by failing to implement basic and industry-standard cybersecurity measures, failing to adequately monitor its systems for unauthorized access, failing to remediate known security vulnerabilities, failing to properly train employees on data security, and failing to timely detect and prevent the Data Breach. Defendants knew or should have known that its inadequate data-security practices created a high

probability of harm to Plaintiff and the Class, yet Defendant consciously failed to take reasonable steps to prevent that harm.

133. Defendant's grossly negligent conduct demonstrated a substantial lack of concern for whether injury would result to Plaintiffs and the Class. Defendant's actions and omissions constituted a reckless indifference to the rights, safety, and interests of Plaintiffs and the Class, whose sensitive personal and medical information Defendant was entrusted to protect.

134. Specifically, Defendant KTVAECU acted with gross negligence by consciously and recklessly ignoring its duty to ensure its vendor Marquis, despite the ubiquity of data breaches, had adequate security safeguards to protect Plaintiff's and Class Members' PII to ensure Marquis' processes were sufficient to detect unauthorized access to their network or compromises of PII stored therein.

135. Further, Defendant Marquis acted with gross negligence by consciously and recklessly ignoring its duty to protect Plaintiffs' PII, despite the ubiquity of data breaches, as described above. Defendant's actions and omissions constituted a reckless indifference to the rights, safety, and interests of Plaintiffs and the Class, whose sensitive personal and medical information Defendant was entrusted to protect.

136. Moreover, Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and by failing to comply with industry standards.

137. Defendants' conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendants' systems.

138. Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

139. Moreover, the harm that has occurred is the type of harm the FTC Act (and similar

state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

140. Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' PII within Defendants' possession.

141. Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiff's and Class Members' PII.

142. Defendants, through their actions and/or omissions, unlawfully breached their duty to timely disclose to Plaintiff and Class Members that the PII within Defendants' possession might have been compromised and precisely the type of information compromised.

143. Defendants breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, the National Institute of Standards and Technology's Framework for Improving Critical Infrastructure Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. § 45, Defendants failed to implement proper data security procedures to adequately and reasonably protect Plaintiff's and Class Members' PII. In violation of the FTC guidelines, *inter alia,* Defendants did not protect the PII they keep; failed to properly dispose of personal information that was no longer needed; failed to encrypt information stored on computer networks; lacked the requisite understanding of its networks' vulnerabilities; and failed to implement policies to correct security issues.

144. It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiff's and Class Members' PII would result in injury to Plaintiff and Class Members. Further,

the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

145. It was foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' PII would result in injuries to Plaintiff and Class Members.

146. Defendants' breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' PII to be compromised.

147. But for Defendants' grossly negligent conduct and breach of the above-described duties owed to Plaintiff and Class Members, their PII would not have been compromised.

148. As a result of Defendants' failure to timely notify Plaintiff and Class Members that their PII had been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

149. As a result of Defendants' gross negligence and breach of duties, Plaintiff and Class Members are in danger of imminent harm in that their PII, which is still in the possession of third parties, will be used for fraudulent purposes, and Plaintiff and Class Members have and will suffer damages including: a substantial increase in the likelihood of identity theft; the compromise, publication, and theft of their personal information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach; and overpayment for the services or products that were received without adequate data security.

## SECOND CAUSE OF ACTION
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class against Defendants)**

197. Plaintiff re-alleges and incorporates by reference all other paragraphs as if fully set forth herein.

198. Defendants required Plaintiff and Class Members to provide and entrust their PII to Defendants as a condition of obtaining Defendants' services.

199. Plaintiff and the Class Members entered into implied contracts with Defendants under which Defendants agreed to safeguard and protect their PII and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

200. KTVAECU entered into implied contracts with Plaintiff and Class Members by collecting their PII and promising to safeguard it against unauthorized disclosures. Marquis entered into implied contracts with Plaintiff and Class members by accepting, collecting, storing, and maintaining the PII given to it by KTVAECU in exchange for safeguarding the PII from unauthorized disclosures. Both Marquis and KTVAECU breached the implied contracts with Plaintiff and Class Members by failing to protect their PII from cybercriminals.

201. Defendants promised and warranted to Plaintiff and Class Members, to maintain the privacy and confidentiality of the PII Defendants' collected from Plaintiff and Class Members and to keep such information safeguarded against unauthorized access and disclosure.

202. Defendants' adequate protection of Plaintiff's and Class Members' PII was a material aspect of these implied contracts.

203. Plaintiff and Class Members conferred a monetary benefit on Defendants in that Plaintiff and Class Members were required to pay Defendants for services, a portion of which should have been specifically allocated towards adequate data security.

204. Without the PII provided by Plaintiff and Class Members, Defendants could not derive revenue from their regular business activities. A portion of the revenue derived from the services provided to Plaintiff and Class Members was to be used to provide a reasonable level of data security and reasonable data security practices. The amount of revenue to be allocated to data security is known to Defendants.

205. Defendants accepted possession of Plaintiff's and Class Members' PII for the purpose of providing goods and services and implicitly agreed to protect their PII from data breaches and keep it confidential and secured.

206. The implied promise included consideration beyond those pre-existing general duties owed under state and federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines and industry standards on data security.

207. The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to PII also protect the confidentiality of that data; (2) taking steps to ensure that the PII that is placed in the control of their agents is restricted and limited to achieve an authorized (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the PII against data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7) other steps to protect against foreseeable data breaches.

208. Based on this implicit understanding, Plaintiff and Class Members accepted Defendants' offers and provided Defendants with their PII to obtain good and services and employment.

209. Plaintiff and Class Members would not have permitted their PII to be collected and stored by KTVAECU had they known that KTVAECU third-party vendor, Marquis, would not safeguard their PII, as promised, or provide timely notice of a data breach.

210. Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendants.

211. Defendants materially breached the implied contracts by failing to safeguard Plaintiff's and Class Members' PII, by failing to adhere to FTC guidelines and industry standards, by ensuring that their vendor Marquis had adequate safeguards to protect the PII, and by failing to provide Plaintiff and Class Members with timely and accurate notice of the Data Breach.

212. As a result of Defendants' failures to fulfill the data security protections promised, Plaintiff and Class Members did not receive the full benefit of their bargains with Defendants, and instead received services of a diminished value compared to that described in the implied contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and that which they received.

213. As a direct and proximate result of Defendants' breach of their implied contracts with Plaintiff and Class Members and the consequential Data Breach, Plaintiff and Class Members have suffered injuries and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they struck with Defendants.

214. Upon information and belief, Defendants have not provided Plaintiff and the Class with information regarding the root cause of the Data Breach and the steps Defendants is taking to ensure that the PII remains safe and protected from further disclosures.

215. The losses and damages Plaintiff and Class Members sustained (as described above) were the direct and proximate result of Defendants' breach of their implied contracts with Plaintiff and Class Members.

216. Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or restitution, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class against Defendants)**

217. Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

218. Upon information and belief, Defendants fund their data security measures entirely from their general revenues, including from payments made by and/or on behalf of their customers, including Plaintiff and Class members, in exchange for services, for which Defendants collected and maintained Plaintiff's and Class Members' PII

219. As such, Plaintiff and Class Members conferred a monetary benefit on Defendants, by providing Defendants with their valuable PII as a portion of value and monies derived from Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each made that is allocated to data security is known to Defendants.

220. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

221. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and

Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

222. Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

223. Defendants acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

224. If Plaintiff and Class Members knew that Defendants had not secured their PII, they would not have agreed to provide their PII to Defendants.

225. Plaintiff and Class Members have no adequate remedy at law.

226. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect PII in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to

prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

227. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

228. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds they unjustly received from them.

## FOURTH CAUSE OF ACTION

**Invasion of Privacy—Intrusion Upon Seclusion and Public Disclosure of Private Facts**
**(On Behalf of Plaintiff and the Class against Defendants)**

229. Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

230. Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

231. Plaintiff and Class Members successfully took reasonable and appropriate steps to keep their PII confidential from the public.

232. Defendants owed a duty to its customers, including Plaintiff and the Class, to keep this information confidential.

233. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff's and Class Members' PII is highly offensive to a reasonable person.

234. The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendants in order to receive services, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were

reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

235. Defendants' conduct also represents a public disclosure of private facts in that the disclosure was made to cybercriminals—individuals in a special relationship with Plaintiff and the proposed Class in that they are the exact group from whom the expected cybersecurity measures are intended to protect Plaintiff and the proposed Class.

236. The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

237. Defendants acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

238. Defendants acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

239. By intentionally failing to keep Plaintiff's and Class Members' PII safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendants intentionally invaded Plaintiff' and Class Members' privacy by:

a. Intentionally and substantially intruding into Plaintiff' and Class Members' private affairs in a manner that identifies Plaintiff and Class Members and that would be highly offensive and objectionable to an ordinary person;

b. Intentionally publicizing private facts about Plaintiff and Class Members, which is highly offensive and objectionable to an ordinary person; and

c. Intentionally causing anguish or suffering to Plaintiff and Class Members.

240. As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from her act, and still goes ahead, she is treated by the law as if she had in fact desired to produce the result." *Id.* cmt. B.

241. Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendants were substantially certain that its failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiff's privacy.

242. Acting with knowledge, Defendants had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

243. As a proximate result of Defendants' acts and omissions, the PII of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

244. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class because their PII is still maintained by Defendants with its inadequate cybersecurity system and policies.

245. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII of Plaintiff and the Class.

246. In addition to injunctive relief, Plaintiff, on behalf of himself and the other members of the Class, also seeks compensatory damages for Defendants' invasion of privacy, which


Case 3:26-cv-00023-TAV-JEM Document 1 Filed 01/20/26 Page 56 of 58 PageID #: 56

includes the value of the privacy interest invaded by Defendants, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## PRAYER FOR RELIEF

Plaintiff and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representatives, and appointing his counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D. Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Dated: January 20, 2026

By: /s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV (BPR # 23045)
Grayson Wells (BPR # 039658)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parkes Avenue, Suite 200
Nashville, TN 37203
Tel : (615- 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

*Attorneys for Plaintiff and the Proposed Class*